CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

JUN 19 2012

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

|  |  |
|---|---|
| MICHAEL J. HUMMEL,<br>*Plaintiff,*<br><br>v.<br><br>DAVID W. HALL, *T/A* COUNTRY MOTOR SALES,<br>*Defendant.* | CASE NO. 6:11-cv-00012<br><br><u>MEMORANDUM OPINION</u><br><br>JUDGE NORMAN K. MOON |

This matter is before the Court on a motion for default judgment filed by Plaintiff Michael Hummel. On May 2, 2011, Plaintiff filed his complaint, asserting a variety of claims against Defendant David Hall, all of which relate to Defendant's sale of a vehicle to Plaintiff. On July 6, 2011, Defendant was personally served with the summons at his business, Country Motor Sales, which is a used car dealership in Lynchburg, Virginia. The summons warned Defendant that if he did not respond to the complaint's allegations within twenty-one days, judgment by default would be entered against him for the relief demanded by Plaintiff in the complaint.

After failing to appear, plead, or otherwise defend against the action, Defendant's default was entered by the Clerk of the Court on August 31, 2011. A certified copy of the Clerk's entry of default was mailed to Defendant. Subsequently, on March 13, 2012, Plaintiff filed the instant motion for default judgment and mailed a copy to Defendant. Defendant did not respond to the motion, and he did not appear at the hearing I conducted on Plaintiff's motion on May 24, 2012. To date, Defendant has still not entered an appearance in this matter. For the reasons that follow, I will grant Plaintiff's motion for default judgment.

## I. BACKGROUND

As alleged in the complaint, the facts of this case are as follows. In July 2010, Plaintiff purchased a 1991 Honda Accord from Country Motor Sales. However, in August 2010, the car broke down. Plaintiff contacted Defendant to inform him about the car trouble, at which time Defendant stated that he had a 1992 Honda Accord at his home that Plaintiff could purchase. On September 6, 2010, Plaintiff took possession of the 1992 Accord, and on September 10, 2010, Plaintiff went to Country Motor Sales to sign a buyer's order. The total price of the car was $4,500.[1] Plaintiff alleges that no other documentation for purchase or financing was presented to or signed by him. Further, Plaintiff contends that he and Defendant did not agree on an interest rate for the purchase of the car.

In October 2010, Plaintiff began making monthly payments in the amount of $250, purportedly as the parties had discussed. Plaintiff alleges that Country Motor Sales retained the car's title and placed a lien on it with the Virginia Department of Motor Vehicles. At some unspecified point in time, Plaintiff looked at the receipts that he had received from Defendant and noticed that the total balance owed was listed as $6,000. Thereafter, Plaintiff began inquiring about the reason for the high balance. On December 2, 2010, Defendant gave Plaintiff the yellow carbon copy of a retail installment sales contract ("RISC") bearing only the signature of Defendant and a date of September 10, 2010. Plaintiff maintains that prior to December 2, 2010, he had never seen the RISC. According to Plaintiff, Defendant was charging 28% annual interest on the purchase of the car. Between October 2010 and September 2011, Plaintiff paid a total of $3,000 to Defendant for the car.

---

[1] The base price of the 1992 Honda Accord was $3,400 with a $500 allowance for the trade-in of the 1991 Honda Accord, on which Plaintiff still owed $1,600.

2

On the basis of the foregoing facts, Plaintiff asserts that Defendant failed to provide requisite disclosures in violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and that Defendant charged a usurious interest rate in violation of Virginia law. Plaintiff seeks $5,070.23 in damages as well as an order declaring Defendant's security interest in the car invalid. Finally, Plaintiff requests an order commanding Defendant to release the lien on the title to the vehicle, to give the title back to Plaintiff, and to return any keys to the vehicle that Defendant is holding.

## II. LEGAL STANDARD

"Rule 55 of the Federal Rules of Civil Procedure authorizes the entry of a default judgment when a defendant fails 'to plead or otherwise defend' in accordance with the Rules." *United States v. Moradi*, 673 F.2d 725, 727 (4th Cir. 1982). The Clerk of the Court's interlocutory entry of default pursuant to Federal Rule of Civil Procedure 55(a) provides notice to the defaulting party prior to the entry of default judgment by the court. *Carbon Fuel Co. v. USX Corp.*, 1998 WL 480809, at *2 (4th Cir. Aug. 6, 1998). After the entry of default, the non-defaulting party may move the court for default judgment under Rule 55(b) of the Federal Rules of Civil Procedure. *Id.* "If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk—on the plaintiff's request, with an affidavit showing the amount due—must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing . . . ." Fed. R. Civ. P. 55(b)(1). However, when, as here, the sum is not certain, default judgment can only be made by the court. Fed. R. Civ. P. 55(b)(2); *Agri-Supply Co. v. Agrisupply.com*, 457 F. Supp. 2d 660, 662 (E.D. Va. 2006).

3

Upon default, the plaintiff's factual allegations are accepted as true for all purposes, excluding the determination of damages. *See Ryan v. Homecomings Fin. Network,* 253 F.3d 778, 780 (4th Cir. 2001) (citations omitted); *see also* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied."). Although the clear policy of the Federal Rules of Civil Procedure is to encourage dispositions of claims on their merits, the entry of default judgment is committed to the discretion of the trial court. *See Moradi*, 673 F.2d at 727 (citing *Reizakis v. Loy*, 490 F.2d 1132, 1135 (4th Cir. 1974)). In reviewing motions for default judgment, courts have referred to the following factors:

> (1) whether there is a large amount of money involved in the litigation; (2) whether there are material issues of fact in the case needing resolution; (3) whether the case involves issues of great public importance; (4) whether the grounds for the motion for a default judgment are highly technical; (5) whether the party asking for a default judgment has been prejudiced by the non-moving party's actions or omissions; (6) whether the actions or omissions giving rise to the motion for a default judgment are the result of a good-faith mistake on the part of the non-moving party; (7) whether the actions or omissions giving rise to the motion for a default judgment are the result of excusable neglect on the part of the non-moving party; and (8) whether the grounds offered for the entry of a default judgment are clearly established.

*Faulknier v. Heritage Fin. Corp.*, 1991 U.S. Dist. LEXIS 15748, at *11–12 (W.D. Va. May 20, 1991) (citing 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure §§ 2684–85 (1990)).

## III. DISCUSSION

As I previously noted, Defendant has completely failed to participate in this litigation. The grounds offered by Plaintiff for the entry of default judgment are clearly established, and Defendant's failure to defend this action does not appear to be the result of excusable neglect or

4

any good-faith mistake on his part. The grounds for Plaintiff's motion are not highly technical, and it is clear that Plaintiff has been prejudiced by Defendant's actions. Although the amount of money involved in this litigation is not inconsequential, it is certainly not so large as to be remarkable. Because of these factors, and in light of Defendant's disregard of Plaintiff's claims, default judgment in Plaintiff's favor is warranted. Accordingly, I proceed to an analysis of Plaintiff's entitlement to the various forms of relief he seeks.

## A. Damages

While Plaintiff's factual averments must be accepted as true, his assessment of the damages to which he is entitled need not be. As stated in his motion for default judgment, Plaintiff seeks $5,070.23 in total damages, including $2,000 in statutory damages under TILA and $3,070.23 in damages under Virginia usury law. I will examine these claims in turn.

### 1. Damages under TILA

Congress enacted TILA in order to promote the informed use of credit. 15 U.S.C. § 1601(a). Indeed, the purpose of TILA is:

> to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.

*Id.* As a means of effectuating these ends, TILA requires creditors who engage in closed-end consumer credit transactions to disclose a long list of items,[2] *see* 15 U.S.C. § 1638(a), and,

---

[2] "Closed-end credit means consumer credit other than 'open-end credit' . . . ." 12 C.F.R. § 226.2(a)(10). Open-end credit is defined as consumer credit extended by a creditor under a plan in which:

> (i) The creditor reasonably contemplates repeated transactions;
> (ii) The creditor may impose a finance change from time to time on an outstanding unpaid balance; and
> (iii) The amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid.

*Id.* § 226.2(a)(20).

5

unless otherwise specifically provided, TILA mandates that they do so before the credit is extended, *id.* § 1638(b); *see also* 12 C.F.R. § 226.17(b) ("The creditor shall make disclosures before consummation of the transaction.").

In the case at hand, Plaintiff alleges that Defendant failed to disclose the amount financed, 15 U.S.C. § 1638(a)(2)(A), the finance charge, *id.* § 1638(a)(3), the annual percentage rate, *id.* § 1638(a)(4), the total of payments, *id.* § 1638(a)(5), the payment schedule, *id.* § 1638(a)(6), and any applicable late fee, *id.* § 1638(a)(10).[3] Accordingly, Plaintiff claims that Defendant violated TILA, and thus that Defendant is subject to statutory damages pursuant to TILA's civil liability provision, which is found at 15 U.S.C. § 1640(a)(2).[4]

A creditor who fails to comply with certain requirements imposed by 15 U.S.C. § 1638 is, in an individual action, liable for "twice the amount of any finance charge in connection with the transaction." 15 U.S.C. § 1640(a)(2)(A)(i). However, the Supreme Court of the United States has held that the cap on statutory damages found in 15 U.S.C. § 1640(a)(2)(A)(ii) applies to recoveries under § 1640(a)(2)(A)(i). *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50,

---

[3] Statutory damages are not available with respect to the late fee disclosure. TILA states that:

> In connection with the disclosures referred to in section 1638 of this title, a creditor shall . . . [be liable for statutory damages] only for failing to comply with the requirements . . . of paragraph (2) (insofar as it requires a disclosure of the "amount financed"), (3), (4), (5), (6), or (9) of section 1638(a) of this title . . . .

15 U.S.C. § 1640(a). Absent from this list is paragraph (10), which addresses any applicable late fee. "This accords with Congress's desire to 'narrow a creditor's civil liability for statutory penalties to only those disclosure[s] which are of central importance in understanding a credit transaction's costs or terms." *In re Ferrell*, 539 F.3d 1186, 1191 (9th Cir. 2008) (quoting S. Rep. No. 96-73, at 7 (1979), *reprinted in* 1980 U.S.C.C.A.N. 280, 285) (alteration in original). While Plaintiff cannot recover statutory damages for Defendant's purported failure to disclose any applicable late fee, the harm caused by Defendant's other failures to disclose is compensable.

[4] "A creditor's failure to disclose any of the information required to be disclosed in connection with a single account, however, entitles the borrower to a *single* recovery only." *Tweedy v. BCAM Title Loans, LLC*, 611 F. Supp. 2d 603, 606 (W.D. Va. 2009) (citing 15 U.S.C. § 1640(g)); *see also Tinsman v. Moline Beneficial Fin. Co.*, 531 F.2d 815, 819 n.9 (7th Cir. 1976) (noting that the legislative history of TILA "indicates that only a single recovery was intended under that Act."). Thus, Plaintiff is only entitled to one recovery for the multiple disclosure violations asserted.

59–60 (2004). The central issue with respect to Plaintiff's claim for damages under TILA is whether the applicable cap is $1,000 or $2,000.

In 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), Pub. L. No. 111-203, 124 Stat. 1376 (2010). In Title XIV of the Act, which is known as the Mortgage Reform and Anti-Predatory Lending Act, Congress, *inter alia*, increased the ceiling in TILA's civil liability provision from $1,000 to $2,000. § 1416(a)(1)(B), 124 Stat. at 2153. Accordingly, Plaintiff seeks $2,000 in statutory damages for Defendant's TILA violations.[5]

However, Plaintiff's entitlement to this damages amount depends on what date the aforementioned increase is considered to have taken effect. Plaintiff asserts that the increase in TILA's civil liability provision took effect on July 22, 2010, and thus before Plaintiff's purchase of the 1992 Honda Accord in September 2010. This issue—that is, deciphering the date on which the increase in TILA's statutory damages cap became (or becomes) effective—appears to be one of first impression. Indeed, it has not been addressed by any of the courts within the Fourth Circuit, and appears not to have been squarely confronted by any courts, nationwide.

Section 4 of the Dodd-Frank Act states: "Except as otherwise specifically provided in this Act or the amendments made by this Act, this Act and such amendments shall take effect 1 day after the date of enactment of this Act." § 4, 124 Stat. at 1390. The Dodd-Frank Act was enacted when it was signed by President Obama on July 21, 2010. Thus, except as otherwise specifically provided, the effective date for the Dodd-Frank Act is July 22, 2010.

---

[5] Regardless of whether the applicable cap on statutory damages for Plaintiff's TILA claims is $1,000 or $2,000, there is no dispute that the ceiling applies. The finance charge actually paid by Plaintiff, according to amortization tables he has attached as an exhibit to his motion for default judgment, was $1,023.41. Thus, the finance charge to be paid would have been even greater. And yet twice the finance charge actually paid clearly would exceed $2,000. Therefore, with respect to statutory damages under TILA, the issue is simply which ceiling amount applies; the finance charge is not relevant, because it is too large for Plaintiff to recover twice its amount under either cap.

7

Correspondingly, the only way that the increase in TILA's civil liability cap would have a different effective date would be if Congress provided one elsewhere in the Act.

Title XIV of the Dodd-Frank Act begins with section 1400, which, in pertinent part, states:

> (c) REGULATIONS; EFFECTIVE DATE.—
>
>> (1) REGULATIONS.—The regulations required to be prescribed under this title or the amendments made by this title shall—
>>
>>> (A) be prescribed in final form before the end of the 18-month period beginning on the designated transfer date; and
>>>
>>> (B) take effect not later than 12 months after the date of issuance of the regulations in final form.
>>
>> (2) EFFECTIVE DATE ESTABLISHED BY RULE.—Except as provided in paragraph (3), a section, or provision thereof, of this title shall take effect on the date on which the final regulations implementing such section, or provision, take effect.
>>
>> (3) EFFECTIVE DATE.—A section of this title for which regulations have not been issued on the date that is 18 months after the designated transfer date shall take effect on such date.

§ 1400(c), 124 Stat. at 2136. Under the Dodd-Frank Act, "transfer date" means the date established under section 311, *see* § 2(17), 124 Stat. at 1390, and section 311 states that unless otherwise provided, the transfer date means "the date that is 1 year after the date of enactment of this Act," § 311(a), 124 Stat. at 1520. Therefore, the designated transfer date is July 21, 2011, *see* Designated Transfer Date, 75 Fed. Reg. 57252 (Sept. 20, 2010), and the delayed effective date referenced above in section 1400(c)(3) is eighteen months later on January 21, 2013. The question becomes whether this delayed effective date applies to all of the sections contained within Title XIV of the Dodd-Frank Act, including section 1416, the operative section that increases the cap in TILA's civil liability provision from $1,000 to $2,000.

As I previously mentioned, this precise question does not appear to have been resolved by any other courts to date. However, I am not writing on a completely blank slate. Of

8

particular relevance to the question presented by the instant matter is the district court's opinion in *Williams v. Wells Fargo Bank N.A.*, No. 11-21233-CIV, 2011 WL 4368980 (S.D. Fla. Sept. 19, 2011). In *Williams*, the plaintiffs brought suit against Wells Fargo for violating section 2605(m) of the Real Estate Settlement and Procedure Act ("RESPA"), 12 U.S.C. § 2601 *et seq. Id.* at *4. Section 2605(m), which was enacted by section 1463 of the Dodd-Frank Act, relates to charges imposed in connection with force-placed insurance. *Id.* at *4–5. The plaintiffs contended that the amendments to RESPA enacted by section 1463, including section 2605(m), were governed by the "effective date" of the Dodd-Frank Act itself, and therefore became effective on July 22, 2010. *Id.* In so arguing, the plaintiff in *Williams*, like Plaintiff in the case at hand, maintained that section 1400(c) only applies to those sections within Title XIV that call for the promulgation of implementing regulations. *Id.* at *5. And because section 2605(m) does not require the implementation of any regulations, the plaintiffs asserted that section 1400(c) is inapplicable to it. *Id.* However, Wells Fargo argued that section 1400(c) of the Dodd-Frank Act sets forth a different effective date applicable to section 1463 (and therefore section 2605(m)). *Id.* Based on its reading of section 1400(c), Wells Fargo maintained that at the time of the suit, section 2605(m) of RESPA had not yet become effective because the delayed effective date of January 21, 2013, which Wells Fargo maintained was applicable, had not yet passed. *Id.*

Ultimately, the court agreed with Wells Fargo. *Id.* In explaining how it read section 1400(c), the court first observed that the plain language of section 1400(c)'s title, "REGULATIONS; EFFECTIVE DATE," indicates that section 1400(c) addresses both regulations *and* effective dates. *Id.* at *6. In this vein, the court noted that Congress's use of a semicolon, as opposed to a colon, indicates that "EFFECTIVE DATE" is not a subcategory of "REGULATIONS." *Id.* "As a result," the court concluded, "a plain reading of the title indicates

9

that section 1400(c) addresses both the regulations required to be implemented under Title XIV and the effective dates for all of the sections under Title XIV, and not . . . only the effective dates of those sections of the Title that call for regulations." *Id.* Thus, even though section 1463 of the Dodd-Frank Act, which enacted section 2605(m) of RESPA, does not require the implementation of regulations, the court found that "it still falls within the scope of section 1400(c) and consequently, does not become effective until 18 months after the designated transfer date." *Id.*[6]

I decline to adopt the *Williams* court's logic in its entirety; however, for the reasons that follow, I agree that section 1400(c) applies to all sections of Title XIV of the Dodd-Frank Act. As a result, I conclude, contrary to Plaintiff's contention, that section 1416 did not become effective on July 22, 2010, and therefore that the relevant cap on statutory damages under TILA at the time he purchased the 1992 Honda Accord was $1,000.

### i. Text of Section 1400(c)

Clearly, determining the effective date of section 1416 hinges on the interpretation of section 1400(c)(3), providing that: "A section of this title for which regulations have not been issued on the date that is 18 months after the designated transfer date shall take effect on such date." It is well established that in interpreting a statute, the first inquiry that a reviewing court must undertake is "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). Of course, "if the statutory language is unambiguous and 'the statutory scheme

---

[6] Briefly, I note that in a series of cases all decided by the same judge, the district court for the Western District of Washington arguably implied that the Dodd-Frank Act's Title XIV amendment of a different provision of RESPA, section 2605(e)(1)(A), took effect on the Act's effective date. *See McDonald v. OneWest Bank, FSB*, No. C10-1952RSL, 2012 WL 555147, at *2 (W.D. Wash. Feb. 21, 2012); *Moore v. Fed. Nat'l Mortg. Ass'n*, No. C11-1242RSL, 2012 WL 424583, at *3 (W.D. Wash. Feb. 9, 2012); *Amini v. Bank of Am. Corp.*, No. C11-0974RSL, 2012 WL 398636, at *3 (W.D. Wash. Feb. 7, 2012). However, the court in these cases did not explicitly state that the amendment had already taken effect, and the court did not provide any analysis or rationales related to its interpretation of the effective date. I point these cases out simply to acknowledge that the *Williams* court's interpretation of section 1400(c)(3) might not enjoy unanimous support.

is coherent and consistent,'" the inquiry ends there. *Id.* (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341 (citations omitted). In light of these factors, I find that the plain language of section 1400(c)(3) is ambiguous with respect to whether that section applies to all of the sections under Title XIV.

Section 1400(c)(3) can be read in one of two different ways. On the one hand, "[a] section of this title for which regulations have not been issued" could be interpreted to mean "a section of this title for which regulations have not been issued, whether or not they are required at all." Under that reading of section 1400(c)(3), the delayed effective date prescribed in that section applies to all sections under Title XIV. On the other hand, "[a] section of this title for which regulations have not been issued" could be interpreted to mean "a section of this title for which regulations have not yet been issued, when they are required." Under such a reading of section 1400(c)(3), the delayed effective date embodied in that section does not apply to those sections under Title XIV, like section 1416, that do not require implementing regulations.[7] Ultimately, nothing in the text indicates that one interpretation is more plausible than the other. Accordingly, I can come to no conclusion with regard to the language of section 1400(c)(3) other than that it is ambiguous as to the breadth of its reach.

### ii. Structure of Section 1400(c) and the Relationship between its Subparagraphs

To resolve this ambiguity, I must look beyond the text of section 1400(c)(3). I begin with the structure of section 1400(c). In *Williams*, the court found great significance in Congress's decision to separate "REGULATIONS" and "EFFECTIVE DATE" with a semicolon. 2011 WL

---

[7] Plaintiff points out that several sections within Title XIV—for example, sections 1403, 1405, 1411, 1412, 1463, 1471, 1472, 1473, and 1483—contain language directing a particular agency to issue implementing regulations or rules.

4368980, at *6. According to the court, "the semicolon suspends the thought regarding regulations and begins a new thought involving effective dates." *Id.* "As a result," the court concluded, "a plain reading of the title indicates that section 1400(c) addresses both the regulations required to be implemented under Title XIV and the effective dates for all of the sections under Title XIV, and not, as Plaintiffs contend, only the effective dates of those sections of the Title that call for regulations." *Id.* While the *Williams* court may indeed be correct, Plaintiff is right to caution against overreliance on section 1400(c)'s punctuation, for "a purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am.*, 508 U.S. 439, 454 (1993). "No more than isolated words or sentences is punctuation alone a reliable guide for discovery of a statute's meaning. Statutory construction 'is a holistic endeavor,' and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter." *Id.* at 455 (quoting *United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988)). Thus, while the *Williams* court's point regarding the punctuation of section 1400(c)'s heading is undoubtedly sound, I will not stop my inquiry there, for doing so runs the risk of ignoring other relevant and important considerations.

Returning to section 1400(c), I observe that neither its structure nor the relationship between its constituent parts necessarily indicates how it should be interpreted and applied. In *Williams*, the court stated that the semicolon in section 1400(c)'s heading indicated that "EFFECTIVE DATES" is not a subcategory of "REGULATIONS." However, one need not rely on Congress's utilization of a semicolon to arrive at that conclusion. Indeed, the very structure of the subsection plainly reveals that the "effective date" subparagraphs—that is, sections

12

1400(c)(2) and (3)—are not subcategories of the "regulations" subparagraph; structurally, all three subparagraphs—(1), (2), and (3)—line up. But that does not necessarily lead to the conclusion that section 1400(c)(3), which I acknowledge is rather curiously buried deep within section 1400, applies to all of Title XIV's sections.

One might argue that, had Congress intended for section 1400(c)(3) to apply to all sections of Title XIV, it could have simply created a new section or subsection (for example, subsection (d)) that would have more clearly applied to the entirety of Title XIV. To be sure, doing so would have been consistent with section 4 of the Dodd-Frank Act, which, at the very beginning of the Act, states that "[e]xcept as otherwise *specifically* provided in this Act or the amendments made by this Act, this Act and such amendments shall take effect 1 day after the date of enactment of this Act." § 4, 124 Stat. at 1390 (emphasis added). However, the task before me is not to question the wisdom behind the manner in which Congress drafted this legislation or to reach a conclusion by negative implication on the basis of what Congress chose not to do. Rather, my charge is to discern what Congress intended with respect to section 1400(c) so that I can determine the effective date of section 1416's amendment of the civil liability provision in TILA.

Like section 1400(c)'s structure, the relationship between its subparagraphs does not, upon close examination, supply an answer to the question presented. Subparagraph (1) discusses the regulations that are required to be prescribed under Title XIV, and effectively states that their final forms must be set out by January 21, 2013, which is, again, eighteen months after the designated transfer date. Further, subparagraph (1) states that the effective date for such regulations shall be no later than one year after the date on which those regulations' final forms are issued. Thus, if, for instance, the final form of a set of regulations were issued on January 20,

2013, they could not take effect any later than January 20, 2014. Subparagraph (2) then links the effective dates for certain sections of Title XIV to the aforementioned rules regarding implementing regulations by stating that those sections of Title XIV take effect on the same date that their implementing regulations take effect. Thus, if, for example, a section's implementing regulations were issued on January 20, 2013, they would have to take effect no later than January 20, 2014, and the date on which they took effect would be the effective date for the section (and all of its provisions) as well. Finally, subparagraph (3) attempts to round out the framework by explaining when a section goes into effect if implementing regulations for it have not been prescribed by January 21, 2013, as subparagraph (1) requires. Subparagraph (3) states that such a section becomes effective on January 21, 2013. It is for this reason that subparagraph (2) includes the phrase "[e]xcept as provided in paragraph (3)," because although a section that requires implementing regulations normally shall become effective on the date that those regulations take effect, when regulations are not issued, the default date of January 21, 2013 applies. As such, subparagraph (3) serves to incentivize the timely promulgation of implementing regulations, to the extent they are needed, by January 21, 2013. What the foregoing analysis makes clear, though, is that the subparagraphs of section 1400(c) comprise a coherent framework under either of the previously delineated interpretations of section 1400(c)(3). Because section 1400(c)'s plain language, its structure, and the relationship among its constituent parts do not provide an answer to whether the section applies to all of Title XIV's sections, I must look beyond the section itself. Fully recognizing the inherent limitations in doing so, I proceed to an analysis of the relevant legislative history.

iii. <u>Legislative History Behind Section 1400(c)</u>

On March 26, 2009, a bill which, *inter alia*, proposed an increase in the cap for civil

damages under TILA from $1,000 to $2,000 was introduced in the United States House of

Representatives. Mortgage Reform and Anti-Predatory Lending Act, H.R. 1728, 111th Cong. §

210(a) (1st Sess. 2009). The particular title of the bill under which this proposal fell also stated

that "[t]he amendments made by this title shall apply to transactions consummated on or after the

effective date of the regulations specified in section 209." *Id.* § 217. Section 209 of that title, in

its entirety, provided:

> Regulations required or authorized to be prescribed under this title or the amendments made by this title—
>> (1) shall be prescribed in final form before the end of the 12-month period beginning on the date of the enactment of this Act; and
>> (2) shall take effect not later than 18 months after the date of the enactment of this Act.

*Id.* § 209. The similarity between these sections and the subparagraphs that were consolidated

under section 1400(c) of the Dodd-Frank Act is undeniable. Moreover, the foregoing sections

reveal that at the time H.R. 1728 was submitted, its authors intended amendments, such as the

amendment of TILA's cap on statutory damages, to become effective only once the regulations

required by other sections had been promulgated and made effective. On May 7, 2009, H.R.

1728 passed the House of Representatives with the aforementioned sections in the same form.

On December 2, 2009, a bill was introduced in the House of Representatives that would

later become the Dodd-Frank Act. The Wall Street Reform and Consumer Protection Act of

2009, H.R. 4173, 111th Cong. (1st Sess. 2009). After the Mortgage Reform and Anti-Predatory

Lending Act was added as Title VII, H.R. 4173 passed the House of Representatives on

December 11, 2009. Once again, the language amending TILA, the applicable provisions

regarding the implementation of regulations, and the effective date all remained unaltered. On

15

May 20, 2010, the United States Senate voted to pass, along with a series of amendments that are irrelevant for the purposes of this memorandum opinion, H.R. 4173, and the bill moved to a conference committee. 156 Cong. Rec. S4078 (daily ed. May 20, 2010).

On June 29, 2010, a conference report to accompany H.R. 4173 was issued proposing the Dodd-Frank Wall Street Reform and Consumer Protection Act. H.R. Rep. No. 111-517, at 1 (2010) (Conf. Rep.). By this point, the amendment of TILA's civil damages cap had been incorporated at section 1416 in Title XIV (the Mortgage Reform and Anti-Predatory Lending Act). *Id.* at 790. Significantly, this version of the Act also included section 1400 in the same form that it presently exists. *Id.* at 773–74. In other words, the sections regarding regulations and effective dates that had previously been distinct from each other were consolidated.

On June 30, 2010, the House of Representatives agreed to the conference report on H.R. 4173. 156 Cong. Rec. H5261 (daily ed. June 30, 2010). And on July 15, 2010, the Senate closed debate and also agreed to the conference report on H.R. 4173. 156 Cong. Rec. S5933 (daily ed. July 15, 2010). Significantly, before debate ceased and prior to the vote being taken in the Senate, Senator Dodd, one of the legislation's co-sponsors, stated:

> There are a number of provisions in title XIV for which there is not a specified effective date other than what is provided in section 1400(c). It is the intention of the conferees that provisions in title XIV that do not require regulations become effective no later than 18 months after the designated transfer date for the CFPB, as required by section 1400(c). However, the conferees encourage the Federal Reserve Board and the [Consumer Financial Protection Bureau] to act as expeditiously as possible to promulgate regulations so that the provisions of title XIV are put into effect sooner.

*Id.* at S5928 (statement of Sen. Dodd). Thus, according to Senator Dodd's statement, which he made just six days before President Obama signed the Dodd-Frank Act into law, it was the intention of the conferees—that is, those members from the Senate and the House of Representatives who served on the conference committee—that provisions in Title XIV, like

16

section 1416, for which regulations are not required, should *not* become effective immediately upon the Act's enactment. Because even one day after the designated transfer date, July 21, 2011, would have been well after Plaintiff purchased the 1992 Honda Accord from Defendant in September 2010, Plaintiff would not, under such a reading of section 1400(c), be eligible for more than $1,000 in statutory damages under TILA.

Lending credence to the view that the increase in the relevant cap on statutory damages has not yet gone into effect is the version of 15 U.S.C. § 1640 supplied by the Government Printing Office ("GPO"). In its version of TILA, the GPO acknowledges the Dodd-Frank Act's amendment of the civil liability cap. In a section entitled "Effective Date of 2010 Amendment," which refers to the Act, the GPO states:

> Amendment by section[] . . . 1416 . . . of Pub. L. 111-203 effective on the date on which final regulations implementing that amendment take effect, or on the date that is 18 months after the designated transfer date, if such regulations have not been issued by that date, see section 1400(c) of Pub. L. 111-203 . . . .

15 U.S.C. § 1640 (available at http://www.gpo.gov/fdsys/pkg/USCODE-2010-title15/pdf/USCODE-2010-title15-chap41.pdf). While this language basically seems to parrot section 1400(c) of the Dodd-Frank Act, it is worth observing that the GPO (and, incidentally, the United States Code Annotated and the United States Code Service) lists the cap in 15 U.S.C. § 1640(a)(2)(A)(ii) as $1,000, not $2,000, thus implying that the increase in the cap has not yet gone into effect. Concededly, this fact is not dispositive of whether the cap increase has become effective, and the manner in which these services elect to present provisions of the United States Code is not controlling. However, when considered in conjunction with the foregoing legislative history, the fact that all three services have not yet changed the cap to $2,000 certainly militates in favor of finding that the increase has not yet gone into effect.

17

Stepping back from Title XIV, I observe that in other parts of the Dodd-Frank Act, Congress made it clear that it was setting out different effective dates for provisions that require the promulgation of implementing regulations or rules and provisions that do not. For example, sections 754 and 774, in their entirety, both state that unless otherwise provided,

> the provisions of this subtitle shall take effect on the later of 360 days after the date of the enactment of this subtitle or, to the extent a provision of this subtitle requires a rulemaking, not less than 60 days after publication of the final rule or regulation implementing such provision of this subtitle.

§§ 754, 774, 124 Stat. at 1754, 1802. In formulating this effective date language, Congress clearly indicated not only that it was setting forth exceptions to the default effective date embodied in section 4 of the Dodd-Frank Act, but also that it wished to distinguish between provisions that require the implementation of regulations, and those that do not. The clarity with which Congress established these alternative effective dates contrasts with the lack of distinction between Title XIV provisions that require the implementation of regulations, and those that do not. And, one could argue, the lack of such distinction in section 1400(c) is indicative of Congress's intention to have the same effective date rules apply for all sections of Title XIV.

Ultimately, in light of the consistency with which previous iterations of the Dodd-Frank Act addressed the effective date of provisions under what eventually came to be Title XIV of the Act, and because of the explicit statement of the conferees' intent as related in the Congressional Record, I conclude that, contrary to Plaintiff's contention, and despite the ambiguity of section 1400(c)'s plain language, the increase in TILA's civil liability cap did *not* become effective on July 22, 2010.[8] Accordingly, Plaintiff is entitled to $1,000, as opposed to $2,000, in statutory damages under TILA.[9]

---

[8] I acknowledge that in at least one instance, reading section 1400(c)(3) as applying to all of Title XIV could lead to an incongruous result that Congress may not have intended. Section 1484 of the Dodd-Frank Act amended the sunset provision in Title VII of the Helping Families Save Their Homes Act of 2009, which is < *continued* . . . >

## 2. Damages under Virginia Usury Law

Plaintiff also seeks damages for Defendant's unilateral imposition of a 28% interest rate, which, Plaintiff contends, exceeds the statutory cap under Virginia law. As a general matter, Virginia law provides that, except as otherwise permitted in the Virginia Code, "no contract shall be made for the payment of interest on a loan at a rate that exceeds 12 percent per year." Va. Code § 6.2-303(A). However, "when there is an obligation to pay interest and no express contract to pay interest at a specified rate . . . ," the legal rate of interest shall be implied. *Id.* § 6.2-301(B). The legal rate of interest is set at an annual rate of 6%. *Id.* § 6.2-301(A). When interest above the statutory maximum is paid, the person paying may recover from the person receiving such payments:

---

<**...** *continued* > otherwise known as the Protecting Tenants at Foreclosure Act ("PTFA"), Pub. L. No. 111-22, 123 Stat. 1632 (2009). As originally enacted, the PTFA was set to be repealed on December 31, 2012. § 704, 123 Stat. at 1662. However, section 1484 amended this expiration date and extended the PTFA by striking "2012" and inserting "2014." § 1484(2), 124 Stat. at 2204. Reading section 1400(c)(3) as applying to all sections of Title XIV means that section 1484's amendment of the PTFA's sunset provision might not take effect until January 21, 2013. To be sure, it is difficult to imagine that Congress intended to allow for such a potentially anomalous result whereby the provisions of the PTFA would expire on December 31, 2012, only to lie dormant for three weeks until January 21, 2013, at which point, like some sort of legislative vampire, they would be revived and extended until 2014. And clearly, if section 1400(c)(3) were read to apply only to those sections within Title XIV that require implementing regulations, then section 1400(c)(3) would not apply to section 1484, and there would be no gap in the applicability of the PTFA. Typically, courts should avoid interpreting statutes in ways that lead to absurd outcomes. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.") (citations omitted). However, in the instant matter, it is not clear that one such result, though potentially anomalous, rises to the level of absurdity. More importantly, this doctrine does not give me license to interpret a given section of an over 800-page act in a particular way simply because that interpretation permits the easier reconciliation of a different section found elsewhere in the act. Further, merely stating the proposition that Congress could not have inadvertently engineered an incongruity or inconsistency *in a major piece of legislation serves to refute it.* Accordingly, I will not interpret section 1400(c) as applying only to those sections in Title XIV that require implementing regulations simply because of the effect that doing so might have on the status of the PTFA.

[9] Plaintiff argues that interpreting the amendment of TILA's civil liability cap to have taken effect on July 22, 2010 would be in accordance with one of the Dodd-Frank Act's explicit purposes—namely, protecting consumers from abusive financial services practices. 124 Stat. at 1376. I agree that there is no obvious reason why Congress would desire or need to delay raising the maximum penalty for noncompliant lending practices from $1,000 to $2,000. However, I reiterate that the task before me is to divine Congress's intent, not to craft post hoc rationalizations for Congress's actions or to interpret a single section of an act in such a way as to better harmonize it with one of the wide-ranging policy goals announced at the very beginning of that act. Undoubtedly, the objectives of a given piece of legislation should not be casually disregarded when interpreting it, *see U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am.*, 508 U.S. 439, 455 (1993), but in the case at hand, the purposes of the Dodd-Frank Act are in no discernable way contravened by my interpretation of section 1400(c).

19

> 1. The total amount of the interest paid to such person in excess of that permitted by the applicable statute;
>
> 2. Twice the total amount of interest paid to such person during the two years immediately preceding the date of the filing of the action; and
>
> 3. Court costs and reasonable attorney fees.

*Id.* § 6.2-305(A).

As I mentioned in note 4, *supra*, on the basis of an amortization table attached as an exhibit to his motion for default judgment, Plaintiff claims that of the $3,000.00 that he paid during the year in which he made monthly payments on the car, $1,023.41 was in the form of interest. Under the legal rate of interest of 6%,[10] Plaintiff's amortization table indicates that during that year, Plaintiff should have paid only $193.78 in interest (thus reducing the remaining principal balance on the car to $1,693.78). Therefore, the excess interest paid by Plaintiff is calculated to be $829.63. Of course, twice the total amount of interest paid is $2,046.82. Combining these two figures produces a subtotal usury damages amount of $2,876.45. However, I will subtract from this amount the remaining principal balance that Plaintiff owes on the car, which is $1,693.78, as well as the interest that has accrued since September 2011, which is calculated to be $76.23. Thus, the total usury damages to which Plaintiff is entitled is $1,106.44.[11]

### B. Non-Monetary Relief

Under Virginia law, a security interest is enforceable against the debtor only if value has been given, the debtor has rights in the collateral, and the debtor has authenticated a security agreement that provides a description of the collateral. Va. Code § 8.9A-203(b)(1)–(3). A

---

[10] Plaintiff also calculates the excess amount of interest paid if the legal rate of interest is not applied. However, I find that the legal rate of interest of 6% must be implied. Although the parties may not have discussed an applicable rate of interest, Plaintiff cannot seriously contend that he thought he was purchasing the car without any financing.

[11] This figure does not include costs or attorney's fees, both of which Plaintiff has separately moved the Court to award.

security agreement is one that "creates or provides for a security interest." *Id.* § 8.9A-102(a)(73). Under the Virginia Code, to authenticate a document simply means to sign it. *Id.* § 8.9A-102(a)(7)(A). Because Plaintiff did not sign a security agreement, Plaintiff maintains that Defendant has no enforceable security interest in the car. I agree; without such a security interest, it was improper for Defendant to place a lien on the title to the car. Accordingly, I will enter an order declaring Defendant's security interest in the car void and unenforceable. Further, that order will direct Defendant to release the lien, to give the car's title back to Plaintiff, and to return to Plaintiff any keys to the vehicle that he is holding.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for default judgment shall be granted. An order will be entered awarding Plaintiff damages in the amount of $2,106.44. Additionally, Defendant's security interest in the 1992 Honda Accord will be declared void and unenforceable. Finally, Defendant will be ordered to release the lien he has placed on the car's title, to give the title back to Plaintiff, and to return to Plaintiff any keys to the vehicle that he possesses.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record. Additionally, to the extent that it is possible, the Clerk of the Court is hereby directed to send certified copies of these documents to Defendant.

Entered this ___19th___ day of June, 2012.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

21